UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X
                                       :

  UNITED STATES                            :

                      :            S5 11 Cr. 1032 (PAE)

          -v-                    :

                      :           OPINION & ORDER

  CARLOS URENA and LIMET VASQUEZ,      :

                      :

               Defendants.        :

                      :

---------------------------------------------------------------------- X

PAUL A. ENGELMAYER, District Judge:

       This decision resolves post-trial motions filed by defendant Limet Vasquez ("Vasquez").

Between March 10, 2014 and April 29, 2014, the Court presided over the jury trial of Vasquez

and co-defendant Carlos Urena ("Urena").[1]  Urena and Vasquez are among the 76 people

charged in a series of superseding indictments with violent crimes and/or narcotics offenses

committed in connection with their membership in, and/or association with, a gang known as the

Bronx Trinitarios Gang.  *See, e.g.*, S1 11 Cr. 1032 (returned Dec. 5, 2011) (Dkt. 4); S4 11 Cr.

1032 (returned Dec. 12, 2012) (Dkt. 401); S5 11 Cr. 1032 (returned Feb. 6, 2013) (Dkt. 539).

       On April 29, 2014, the jury returned its verdict.  Urena was convicted on all counts, and

the jury found all racketeering acts as to him proven.  Vasquez was convicted of three counts and

acquitted of two.  *See* Dkt. 1097–98 ("Verdict Forms").  Specifically, Vasquez was convicted on

Count One, which charged him with participating in a racketeering enterprise, *see* 18 U.S.C.

§§ 1961, 1962(a); Count Two, which charged him with conspiracy to commit racketeering, *see*

*id.* § 1962(d); and Count Eight, which charged him with participating in a conspiracy to

---

[1] Urena was first charged in the indictment filed on December 5, 2011, S1 11 Cr. 1032.  Vasquez
was added to the indictment when it was superseded on December 12, 2012, S4 11 Cr. 1032.

distribute narcotics, specifically, 100 kilograms and more of marijuana, 28 grams and more of "crack" cocaine, a quantity of powder cocaine, and a quantity of oxycodone, *see* 21 U.S.C. § 846.  Vasquez was acquitted on Count Three, which charged him with murder in aid of racketeering of Ka'Shawn Phillips on September 3, 2005, *see* 18 U.S.C. § 1959(a)(1); and Count Nine, which charged him with using a firearm during and in furtherance of that murder, *see id.* § 924(j)(1).

Within Count One, the substantive racketeering count, as to Vasquez, the jury found that the Government had proven three predicate acts:  (1) Racketeering Act One (Part A), charging a conspiracy to murder Ka'Shawn Phillips on September 3, 2005; (2) Racketeering Act Four, charging the attempted murder of Luis Montas on September 2, 2005; and (3) Racketeering Act Nine, charging the same conspiracy to distribute narcotics as charged in Count Eight.  The jury found that the Government had not proven Racketeering Act One (Part B), an alternative means of proving Racketeering Act One, which charged that Vasquez had aided and abetted the murder of Ka'Shawn Phillips.[2]

---

[2] For the purpose of Urena and Vasquez's trial, the S5 Indictment was redacted, so as to exclude counts and racketeering acts in which neither defendant was charged.  The Court here refers to the counts and racketeering acts as re-numbered in the redacted Indictment.  The final judgment in the case, however, will reflect the numbering in the S5 Indictment.  For clarity's sake, the following chart identifies the count and racketeering act in the S5 Indictment to which each count and racketeering act in the redacted Indictment corresponds:

| Numbering of Counts | | Numbering of Racketeering Acts | |
|---|---|---|---|
| **Redacted Indictment** | **S5 Indictment** | **Redacted Indictment** | **S5 Indictment** |
| Count One | Count One | RA One | RA One |
| Count Two | Count Two | RA Four | RA 13 |
| Count Three | Count Three | RA Nine | RA 39 |
| Count Eight | Count 32 | | |
| Count Nine | Count 33 | | |

On July 17, 2014, Vasquez moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33.  *See* Dkt. 1224 ("Def. Br.").  Vasquez argues that the evidence was insufficient to support a finding of "proven" on any racketeering act which the jury found, and, therefore, was also insufficient to support a guilty verdict on Count Eight (which tracked Racketeering Act Nine).  Accordingly, he moves for a judgment of acquittal on Counts One and Eight.[3]  On August 23, 2014, the Government opposed these motions.  Dkt. 1263 ("Gov. Br.").

For the reasons that follow, the Court denies Vasquez's motions under Rule 29, with one exception:  The Court overturns the jury's finding of "proven" as to Racketeering Act Four, finding as a matter of law that the evidence at trial was insufficient to establish that Vasquez had the specific intent to murder Luis Montas.  This outcome leaves intact Vasquez's conviction on Count One.  To support a conviction on that count, the Government was required to prove that Vasquez had participated in the conduct of a racketeering enterprise through a pattern of two or more specified racketeering activities.  *See, e.g.*, *United States v. Quinones*, 511 F.3d 289, 314 (2d Cir. 2007).  Because the evidence was sufficient to establish that Vasquez committed two charged racketeering acts—the conspiracies to murder Phillips and to distribute narcotics—his conviction on Count One stands.  The Court therefore denies Vasquez's motion for a judgment of acquittal on Counts One and Eight.  The Court also denies Vasquez's motion for a new trial.

---

[3] Vasquez has not moved for a judgment of acquittal on Count Two, the racketeering conspiracy charge.

## I.      Motion for Judgment of Acquittal[4]

The Court first reviews the legal standards governing a motion for a judgment of acquittal. Then, for each racketeering act and count at issue, the Court reviews and evaluates the relevant evidence.

### A.      Legal Standards

"A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (citation omitted); *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002). "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (internal citations omitted). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted). It is not the trial court's role to "'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)). Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (citation omitted).

---

[4] The facts in this section are drawn from the Trial Transcript ("Tr.") and the exhibits admitted at trial, as offered by the Government ("GX") and the defense ("DX").

In considering the sufficiency of the evidence supporting a guilty verdict, the Court must view the evidence in the light most favorable to the Government, with all reasonable inferences drawn in its favor.  *See Mi Sun Cho*, 713 F.3d at 720; *Hawkins*, 547 F.3d at 70; *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000) ("[We] resolve all inferences from the evidence and issues of credibility in favor of the verdict.").  "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court."  *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).  Moreover, the Court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130.  *See also United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002) ("[W]e consider the evidence as a whole.").

The credibility of a testifying witness is particularly within the province of the jury, not the reviewing court.  *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony.") (internal quotation marks omitted).  For these reasons, the Second Circuit has emphasized that "the proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury, not in an appellate brief.'"  *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (quoting *United States v. Friedman*, 854 F.2d 535, 558 (2d Cir. 1988)).  It is for the jury to decide how those arguments bear on "the weight [it] should accord to the evidence."  *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012).

The jury is, further, permitted to give substantial weight to a single witness's testimony. "A conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (internal quotations omitted). "Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency, and a challenge to '[t]he weight is a matter for argument to the jury, not a ground for reversal on appeal.'" *Id.* (quoting *Roman*, 870 F.2d at 71).

The deference accorded to the jury's verdict "is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992) (internal quotation marks omitted). "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct," *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001), *abrogated on other grounds by United States v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008), and can be shown based on circumstantial evidence alone, *United States v. Gordon*, 987 F.2d 902, 906–07 (2d Cir. 1993). *See also United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[T]he prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt."); *United States v. Miranda-Ortiz*, 926 F.2d 172, 176 (2d Cir. 1991) (same). For example, a defendant's "knowing and willing participation in a conspiracy may be inferred from . . . [his] presence at critical stages of the conspiracy that could not be explained by

happenstance, or a lack of surprise when discussing the conspiracy with others." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 113 (2d Cir. 2008).

Finally, in a criminal case, a conviction on one count of an indictment may not be challenged merely because it is inconsistent, or in tension, with an acquittal on another count. *See United States v. Powell*, 469 U.S. 57 (1984); *Dunn v. United States*, 284 U.S. 390 (1932). As the Second Circuit has explained, "[a] court knows only what the jury's verdicts were, not what the jury found, and it is not within the province of the court to attempt to determine the reason or reasons for verdicts that are inconsistent." *United States v. Acosta*, 17 F.3d 538, 546 (2d Cir. 1994); *see also United States v. Chang An-Lo*, 851 F.2d 547, 560 (2d Cir. 1988) (rejecting challenge based on purportedly inconsistent verdicts on racketeering and narcotics conspiracy counts). That is particularly so when courts have no way of knowing whether a verdict is the result of a "mistake, compromise, or lenity." *Powell*, 469 U.S. at 65; *see also id.* at 66 ("We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them.").

## B.   Racketeering Act One (Part A)

Vasquez first challenges the jury's finding of "proven" as to Racketeering Act One (Part A), which alleged that Vasquez conspired to murder Ka'Shawn Phillips, on September 3, 2005, in the vicinity of 78 Saratoga Avenue, Yonkers, New York, in violation of New York Penal Law, Sections 105.15 and 125.25.

### 1.   Facts

The Trinitarios Gang was formed in the Rikers Island prison in the early 1990s to protect inmates primarily, but not exclusively, of Dominican origin. *See, e.g.*, Tr. 177–84 (Gonzalez).

Gang members engaged in criminal activity within prison, including carrying weapons and distributing narcotics. *See, e.g.*, Tr. 185 (Gonzalez). Eventually, the gang spread throughout the New York City area. And its members began to commit crimes—including narcotics trafficking, assault, armed robbery, attempted murder, and murder—outside of prison. *Id.*

In the Bronx, the gang eventually came to be dominated by a group that called itself the "Bad Boys." *See, e.g.*, Tr. 234–47 (Gonzalez). Seven cooperating witnesses testified at trial— Richard Gonzalez (a/k/a "Webb"), Jose Diaz (a/k/a "Joselito"), Jose Cruz (a/k/a "Prostituto"), Alexander Toribio (a/k/a "Campe"), Juan Franco (a/k/a "Juan Carlo"), Jose Ballenilla (a/k/a "Correa"), and Juan Nunez (a/k/a "Jesu Christo").[5] Four—Diaz, Cruz, Ballenilla, and Nunez— testified that they were members of the Bad Boys. These witnesses collectively testified about many dozens of acts of violence that they and others committed in connection with their membership in the gang in general and the Bad Boys in particular. *See, e.g.*, Tr. 1204–19, 1305– 20 (Diaz); 1940–92, 2013–99 (Cruz); 3277–3304 (Ballenilla); 3818–29, 3836–52 (Nunez).

One such act of violence was the murder, on the night of September 3, 2005, of Ka'Shawn Phillips, then age 16. The evidence at trial was overwhelming that Phillips was murdered by a group of Trinitarios gang members who targeted him, chased him, stabbed him more than 20 times, and shot him twice in the vicinity of 78 Saratoga Avenue in Yonkers. The motive for the murder was a brawl that Phillips, believed by the Trinitarios to belong to a rival gang, had been in the previous evening with members of the Trinitarios Gang's Yonkers affiliate. Two of the Yonkers members asked the Bronx Trinitarios to exact revenge on Phillips for them,

---

[5] In their testimony, the cooperating witnesses primarily referred to gang members by their nicknames, or "street names." The trial testimony established that Vasquez's street name was "Blood." For the sake of uniformity, the Court here refers to gang members by their true last names, except when quoting directly from testimony.

and the Bronx members agreed to do so.  The evidence further established that two Trinitarios members shot Phillips.  The first shot multiple times at or in Phillips' direction, wounding him in the chest but not killing him.  Several Trinitarios then swarmed the wounded Phillips, striking and stabbing him repeatedly.  The second shooter shot Phillips point-blank in the head, killing him.

The evidence established in detail how the Phillips murder was planned and executed, including the roles played in it by Vasquez and Urena.  Although it included testimony from law enforcement and civilian witnesses, as well as physical and forensic evidence, the heart of this evidence was lengthy testimony from five cooperating witnesses:  Diaz, Cruz, Franco, Toribio, and Nunez.  *See* Tr. 1164–93 (Diaz), 1907–32 (Cruz), 2835–42 (Franco), 2987–3010 (Toribio), 3852–73 (Nunez).  Each had pled guilty, pursuant to a cooperation agreement, to (among other crimes) murder in aid of racketeering in connection with the Phillips murder.

Specifically, all five cooperating witnesses testified that, on the evening of September 3, 2005, a meeting was held in Van Cortlandt Park, involving approximately 10 or more gang members.  The Yonkers Trinitarios gang members present asked the Bronx Trinitarios gang members to retaliate against Phillips for a brawl that had taken place between Phillips and a Yonkers Trinitarios member, Juan Martinez, the previous day, on or near Saratoga Avenue. *See, e.g.*, Tr. 1171–72 (Diaz), 1907–09 (Cruz), 2835–36 (Franco), 2988–93 (Toribio), 3853–54 (Nunez).  The Yonkers gang members, who included Martinez, explained that they could not participate directly in the attack on Phillips, lest they be recognized by their Yonkers neighbors.  *See, e.g.*, Tr. 3860 (Nunez) ("Q: Was anything said about why they were in a different position than the Bad Boys in terms of getting caught?  A: Yes, because we were from the Bronx and they didn't know us, and they were right—I believe they were from the

same hood.  They were right up the block from the situation.  Q: The same neighborhood as where the attack was going to take place?  A: Yes.").  The Bronx Trinitarios agreed to attack Phillips in retaliation.  Nunez testified that Vasquez—or "Blood," as he was known by the Trinitarios—was present during the meeting in Van Cortlandt Park, and that he volunteered to accompany the group to Yonkers.  *See* Tr. 3854 ("Q: Who do you remember being at this meeting?  A: Me, Salcedo, *Blood*, Campe, Prosti, Percha, Juan Carlo, Fantasma, Fresh, Sony, Joselito, Boquita, Trencita, and various other members of the Bad Boy set.") (emphasis added); Tr. 3860 ("Q: So what happened next?  A: So then Percha asked us who wanted to volunteer, who wanted to go.  I was one of the individuals that volunteered to go.  Salcedo volunteered, Prosti.  Me, Salcedo, Prosti, *Blood*, Juan Carlo, Fresh, Fantasma, Joselito already had the car, and Campe.") (emphasis added).

Between seven and 10 Bronx Trinitarios members then traveled, in two cars, to Yonkers.  Martinez and the other Yonkers Trinitarios drove in a Jeep and led the way to Yonkers.  Most of the Bronx Trinitarios followed in a van stolen (and driven) by Diaz.  *See, e.g.*, Tr. 1911–13 (Cruz).  Nunez testified that Vasquez was in the van with him when he traveled to Yonkers.  *See* Tr. 3862 ("Q: Who else went in the van?  A: Joselito was driving, Prosti was in the front.  Then it was *Blood*, me, Juan Carlo, Fantasma, and Fresh.") (emphasis added).  Vasquez was armed with a knife or a knife-like object:  Cruz described it as a blade that opens up, like "a switchblade," *see* Tr. 1915; Nunez recalled it as a sword that was about three feet long, *see* Tr. 3863.

Once the two cars arrived in Yonkers, the five cooperating witnesses testified, the Yonkers Trinitarios pointed out Phillips to the Bronx Trinitarios as the person to be attacked.  The car driven by the Yonkers affiliates then parked on Elinor Place, some distance south of

where Phillips had been standing, at or near 78 Saratoga Avenue.  While the Yonkers affiliates, including Martinez, waited by their car, the Bronx Trinitarios exited their car, charged towards Phillips, and carried out the fatal attack on him.  *See, e.g.*, Tr. 1189–90 (Diaz), 1921–30 (Cruz), 2837–39 (Franco), 2997–3007 (Toribio), 3867–70 (Nunez).

The trial testimony of the five cooperating witnesses was unanimous in identifying Toribio, or "Campe," as the first shooter.  Toribio himself admitted (and testified at trial) that his nickname at the time of the murder was "Campe," that he had been among the Trinitarios gang members who had agreed to carry out the Phillips homicide at the behest of the Yonkers affiliates, and that he had been the first shooter.  *See* Tr. 2953–3017.  All five cooperating witnesses also identified Urena as the second, fatal shooter.  In between these two gunshots, the other participants in the attack, including Cruz and Nunez, stabbed and/or struck Phillips while he lay on the ground.  Both Cruz and Nunez testified that they observed Vasquez stabbing Phillips, with a knife (Cruz) or sword (Nunez).  *See* Tr. 1859–60, 1924–25 (Cruz) ("Q: What, if anything, did you see Blood doing?  A: Stabbing the victim."); Tr. 3868 (Nunez) ("I saw Blood hit him with the sword in back of me."); Tr. 4157 ("When I'm over the kid and I see [Blood] swinging his sword at the kid, and I believe he stabbed him with it, too.").

After Phillips was murdered, the Bronx Trinitarios returned to the stolen van driven by Diaz.  Nunez testified that he traveled from Yonkers in the van with Vasquez.  *See* Tr. 3870.

### 2.      Conspiracy to Commit Murder Under New York Law

In evaluating the sufficiency of the evidence to support a racketeering act charged under New York law, the Second Circuit looks to whether the evidence would be sufficient to support a

11

conviction under such law.  *See United States v. Pimentel*, 346 F.3d 285, 297 (2d Cir. 2003); *United States v. Carrillo*, 229 F.3d 177, 183 (2d Cir. 2000) ("If the conduct proved at trial did not satisfy the elements of the offense as defined by state law, a jury could not find that the defendant had committed the state law offense charged as a predicate act of racketeering.").

To establish a conspiracy under New York law, the evidence must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offense that was the object of the conspiracy; and that an overt act in furtherance of the conspiracy was committed.  *See* N.Y. Penal Law § 105.15 ("A person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct."); *id.* § 105.20 ("A person shall not be convicted of conspiracy unless an overt act is alleged and proved to have been committed by one of the conspirators in furtherance of the conspiracy.").  A defendant may be convicted for murder if, with the intent to cause the death of another person, he caused, or aided and abetted in causing, the death of that person.  *See id.* § 125.25.

### 3.     Analysis

Vasquez challenges the jury's finding that he joined and participated in the conspiracy to murder Phillips.  He contends that "there is no proof in the trial record that Vasquez agreed to act in concert with anyone else, much less with the intent that Phillips be murdered."  Def. Br. 27; *see also id.* at 33 ("There is no application of the evidence that could allow the jury to infer beyond a reasonable doubt that Vasquez had the requisite homicidal intent and association to be convicted of the conspiracy to murder Ka'Shawn Phillips and for this reason, the conviction must be vacated as to this racketeering act.").

Vasquez is wrong.  The evidence at trial, viewed in the light most favorable to the Government, established that the Bronx Trinitarios, during a meeting in Van Cortlandt Park, agreed to retaliate against Phillips on behalf of their Yonkers affiliates.  The evidence further supported that Vasquez was present at that meeting and volunteered to travel with the group to Yonkers.  The Bronx Trinitarios traveled together to Yonkers in a van; they were armed with knives, bottles, and two handguns.  Once there, the Yonkers affiliates specifically pointed Phillips out as the person to be attacked.  The Trinitarios then exited the van, walked towards Phillips, and immediately began firing gunshots at him.  Phillips was wounded immediately. The Trinitarios then swarmed him, stabbing him more than 20 times, with Vasquez being among the stabbers.  Urena killed Phillips with a point-blank gunshot to the head.

To sustain Vasquez's conspiracy conviction, the evidence must be sufficient to find that there was an agreement to murder Phillips, and that Vasquez joined in that agreement.  As to the first element, the jury could have reasonably inferred that, during the meeting at Van Cortlandt Park, the group of Bronx Trinitarios agreed to attack Phillips, and that either then or in the course of the attack that unfolded, the group further agreed to murder him.  "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct."  *See Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (internal quotation marks omitted); *see also Pitre*, 960 F.2d at 1121 ("[A] conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.") (citation omitted).  The jury could find such an agreement among the Trinitarios who traveled to Yonkers based on the facts that the Trinitarios:  (1) traveled to Yonkers heavily armed, with two guns and several knives, with the express purpose of retaliating against Phillips; (2) descended upon

13

Phillips; (3) fired several unprovoked gunshots at Phillips; (4) stabbed Phillips more than 20 times; and (5) actually killed Phillips with a gunshot to the head.  Indeed, the narratives told by the cooperating witnesses uniformly described a coordinated, planned, and savage group "hit" upon a deliberately chosen victim—a paradigmatic conspiracy to murder.

The second element is the focus of Vasquez's challenge.  He argues that the jury could not have reasonably concluded that he joined the conspiracy to murder Phillips or that he possessed the intent to murder Phillips.  A defendant's membership in a criminal conspiracy, however, "may be established entirely by circumstantial evidence."  *See Miranda-Ortiz*, 926 F.2d at 176; *see also United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997).  And "once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming."  *United States v. Jackson*, 180 F.3d 55, 74 (2d Cir. 1999).

Here, the assembled evidence permitted the jury to find the following about Vasquez: that he (1) was present in Van Cortlandt Park when the Trinitarios agreed to attack Phillips in revenge for the brawl with Martinez; (2) traveled to Yonkers armed with a knife or sword in a van alongside the other, heavily armed Bronx Trinitarios; (3) observed that two of his fellow Trinitarios were armed with guns; (4) was in position to observe the gunshots that Toribio fired at Phillips; (5) joined the other Trinitarios who then descended en masse upon the wounded Phillips; and (6) stabbed Phillips with a switchblade or a sword while Phillips lay bleeding on the ground, after Phillips had already been wounded by a gunshot to the chest and by several other stab wounds.  From these facts, the jury could easily have found the requisite intent.  They supplied a solid basis on which to infer that Vasquez participated in the conspiracy—like the five cooperating Trinitarios witnesses who pled to participating or conspiring to participate in the murder—with the intent that Phillips be murdered.  *See In re Terrorist Bombings*, 552 F.3d at

113 ("[K]nowing and willing participation in a conspiracy may be inferred from . . . [the defendant's] presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others.").

At trial, tellingly, Vasquez never articulated the defense that he, or any other participant in the Phillips homicide, had lacked intent to murder.  Any such claim would have been tenuous, if not risible, given the cooperators' testimony as to their murderous intentions, as corroborated by the fact that Phillips was shot twice, once each in the chest and head, and by the sheer number of stab wounds to Phillips' torso and upper body that the swarm of gang members inflicted on him.  Instead, Vasquez's defense to the counts and acts involving the Phillips homicide was one of non-participation.  He argued that the jury should not credit the two cooperating witnesses (Cruz and Nunez) who testified that he was a participant.  But, if one credits that testimony, as the jury did, the inference is difficult to avoid—and in any event, it is supported by the evidence—that he and his fellow assailants intended to kill Phillips.

Vasquez notes that the other three cooperating witnesses who admitted participating in the attack on Phillips did not identify him as a participant.  But for two reasons, that fact does not avail Vasquez on this motion.  First, as a matter of law, the Court is required on a Rule 29 motion to view the evidence in the light most favorable to the Government, and to "defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011); *see also United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) ("Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility."); *Diaz*, 176 F.3d at 92 ("A conviction may be sustained on the basis of the testimony of a single accomplice.").

Second, the evidence supplied sound bases on which the jury could choose not to treat the testimony of the other three cooperators as undermining Cruz's and Nunez's testimony that Vasquez joined in the attack.  Diaz testified that he did not know Vasquez, *see* Tr. 1141 (Diaz testifying that he did not know the person depicted in GX 8—*i.e.*, Vasquez), making it unsurprising that he failed to identify Vasquez as a participant in the murder.  And Diaz further testified that Trinitarios unknown to him participated in the murder.  *See* Tr. 1136 ("There were Trinitarios that I did not know.").  Toribio, for his part, testified that he knew Vasquez and recalled seeing him at Trinitarios meetings, *see* Tr. 3014, but that he did not remember or recall whether he ever witnessed Vasquez assault or stab someone, *see* Tr. 3147–48.  Toribio never categorically testified, however, that Vasquez was not present at, or did not participate in, the murder, only that he did not recall Vasquez's doing so.  Finally, Franco specifically identified only six participants in the murder.  *See* Tr. 2838 ("Q: Who were the people you remember?  A: Campe, Prosti, Fresh, Salcedo, myself, and Jesu Christo.").  He did not name Vasquez.  But Franco acknowledged that he did not remember everyone who participated, *see* Tr. 2836, and, although Franco testified that he did not *believe* Vasquez had participated, his testimony as to this point was less than definitive.  *See* Tr. at 2904–05 ("Q: Did you believe at the time of this conversation with Mr. Vasquez that he was involved—that he had been involved in the Yonkers homicide?  A: No."); Tr. 2906 (Franco) ("Q: But that is what you told [the Government], as far as you knew, [Vasquez] was not involved [in the murder], isn't that so?  A: I have no memory of him being there.").  In short, the testimony of these three cooperating witnesses was not nearly so exculpatory as to lead, let alone compel, a reasonable jury to disregard Cruz's and Nunez's testimony that Vasquez did, in fact, participate in the conspiracy to murder Phillips.

Vasquez separately argues that the jury's finding on Racketeering Act One (Part B) that he did not aid and abet the murder of Phillips means that the jury's verdict was inconsistent. *See* Def. Br. 27). But, for two independent reasons, this argument does not afford Vasquez relief. First, as a matter of law, an inconsistency within a jury's verdict does not supply a basis for overturning it. *See Powell*, 469 U.S. at 67; *Dunn*, 284 U.S. at 393; *Acosta*, 17 F.3d at 546; *Chang An-Lo*, 851 F.2d at 560.

Second, the verdict here was *not* inconsistent. Based on the evidence, the jury could have reasonably concluded that the Government had proven that Vasquez: (1) was present when the plan to attack Phillips was formed, (2) knowingly joined that plan, (3) accompanied the co-conspirators to Saratoga Avenue, and (4) was among those who stabbed Phillips there, appreciating that Phillips was in the process of being murdered. However, the jury could reasonably have concluded that Vasquez's acts there did not advance the cause of killing Phillips, so as to support a finding of aiding and abetting murder. Phillips already lay on the ground, shot once, when the stabbing Trinitarios set upon him; the medical testimony was that Phillips' stab wounds, together and separately, were likely not fatal, *see* Tr. 943–65, 1105–07; *see also* GX 3509A; and there was no evidence that Vasquez assisted Urena to fire the fatal shot. On this basis, the jury could intelligibly have differentiated between the charge of conspiracy to commit murder and the substantive crime of murder (or aiding and abetting murder).[6]

---

[6] Rejecting an instruction sought by the Government, the Court did not instruct the jury that it could find substantive liability for the murder of Phillips (as charged in Racketeering Act One (Part B) and Count Three) based on a *Pinkerton* theory of liability. *See* Tr. 4692–95. Such an instruction would have permitted the jury to find Vasquez substantively liable for the foreseeable acts of his co-conspirators. As the Court explained, given the complexity of the overall jury instructions and the availability of other theories of secondary liability, a *Pinkerton* instruction risked creating "a toxic stew of confusion." Tr. 4593. The Court's view at the time was also that, given Cruz's and Nunez's testimony that Vasquez had personally participated in the attack on Phillips, if the jury credited Cruz and Nunez, it would likely find Vasquez liable both on the

Conceivably, too, the jury could have credited that Vasquez joined the decision at Van Cortlandt Park to murder Phillips and accompanied the other Trinitarios to Saratoga Avenue, but, particularly given Cruz's and Nunez's differing recollections as to the weapon that Vasquez used to stab Phillips, it may not have been persuaded beyond a reasonable doubt that Vasquez personally stabbed Phillips so as to merit liability for the substantive offense.

Or, the jury could simply have decided, in a compromise or in a decision to enable it to complete deliberations, to acquit Vasquez of substantive liability for the murder while finding him to have conspired to commit it. As to this point, the series of events leading to the verdict may be significant. The jury originally reported a partial verdict as to Vasquez, which convicted him of Counts One, Two, and Eight, including finding Racketeering Acts One (Part A), Four, and Nine proven. *See* Tr. 5369–73. However, it was unable to report a verdict for Vasquez as to Racketeering Act One (Part B) or Count Three, which charged murder in aid of racketeering with respect to the Phillips homicide. *Id.* The jury was directed to resume deliberating on these open charges only, and only as to Vasquez, the jury having convicted Urena on all counts. *See* Tr. 5373–74. It was several hours later that the jury completed its work, reporting a verdict of not proven as to Racketeering Act One (Part B) and not guilty as to Count Three. *See* Tr. 5382. Under these circumstances, it is not persuasive to interpret the jury's decisions on these two final matters as undercutting its earlier finding against Vasquez as to Racketeering Act One (Part A).

---

conspiracy and the substantive murder charges, such that the situation in which a *Pinkerton* instruction might become relevant was unlikely to arise. *See* Tr. 4694. In fact, precisely that situation appears to have arisen, in which the jury found Vasquez to have conspired to murder Phillips, as reflected in its partial verdict containing that finding, but struggled with his substantive liability before finding, eventually, against such liability. *See infra*, at p. 2, 18–19. It must be acknowledged that, in light of the jury's finding that Vasquez conspired to murder, had the Court given a *Pinkerton* instruction, the jury might have found Racketeering Act One (Part B) also proven as to Vasquez, and might have convicted him on the substantially parallel Count Three.

Regardless, "it is not within the province of the court to attempt to determine the reason or reasons for verdicts that are inconsistent," *Acosta*, 17 F.3d at 546, particularly when there is no way of knowing whether a verdict is the result of a "mistake, compromise, or lenity," *Powell*, 469 U.S. at 65.  The Court rejects Vasquez's implicit invitation for the Court to undo the jury's verdict as to Racketeering Act One (Part A) on the grounds of inconsistency.

Because there was sufficient evidence upon which the jury could find that Vasquez knowingly joined, and participated in, a conspiracy to murder Phillips, the motion for a judgment of acquittal as to Racketeering Act One (Part A) is denied.

### C.      Racketeering Act Four

Vasquez also seeks to overturn the jury's finding as to Racketeering Act Four.  The jury found beyond a reasonable doubt that Vasquez attempted to murder, or aided and abetted in the attempted murder of, Luis Montas, a member of Dominicans Don't Play ("DDP"), a rival gang, on September 2, 2005, in violation of New York Penal Law, Sections 20.00, 110.00, and 125.25.

### 1.      Facts

The attack on Montas occurred on September 2, 2005 in the vicinity of 164th Street and Fort Washington Avenue in Manhattan.[7]  Tr. 1973–80 (Cruz).  Officer Tirado of the NYPD testified at trial that he had received a "radio run for an unconscious"—*i.e.*, a report of an unconscious victim—and that he responded to the scene.  Tr. 1630.  Once there, Officer Tirado identified the victim of the attack as Luis Montas.  *See* Tr. 1633.  Officer Tirado testified that Montas suffered a "laceration to his forehead and a laceration to his right leg," and that Montas was brought to New York Presbyterian Hospital, at 168th Street and Broadway.  *Id.*  The parties

---

[7] The Indictment incorrectly identified this address as being in the Bronx, New York.

stipulated that, if called as a witness, a representative of New York Presbyterian Hospital would

have testified that:

> On or about September 2, 2005, at approximately 10:47 p.m., Luis Montas, a 19-year-old male, was admitted into New York Presbyterian Hospital to be treated for facial lacerations as well as a 2.2-centimeter linear laceration in his right lateral thigh. Montas informed treating physicians that he was twice hit in the face with a bottle and was twice stabbed in his right leg. Montas was discharged on or about September 4, 2005 from New York Presbyterian.

Tr. 4413–14.

Three cooperating witnesses testified regarding the attack on Montas: Diaz, Cruz, and

Nunez. *See* Tr. 1211–15 (Diaz), 1973–80 (Cruz), 3836–41 (Nunez). Cruz testified that he had

heard from another Trinitarios member that a group of DDPs were in the vicinity of 164th Street

and Fort Washington. Cruz testified that he and a group of Bronx Trinitarios traveled to that

location by bus, stopping first at 181st Street, where Cruz met with a group of Manhattan

Trinitarios, including "Leo." Tr. 2520–26. Leo gave one of the Trinitarios, Zurdo, a gun. *Id.*

The other Trinitarios were armed with "bottles, knives, [and a] machete." Tr. at 2522; *see also*

Tr. 1213 (Diaz) (testifying that he was armed with "one of those clubs that are used to lock the

steering wheel on cars"); Tr. 3839 (Nunez) (testifying that he had a machete, that Cruz, Urena,

and Vasquez all had knives, and that Zurdo had "a .380 with no clip and a bullet in the

chamber"). The testimony leaves unclear whether Vasquez traveled with the Trinitarios from the

Bronx or joined the group at 181st Street, and whether Vasquez, or various other Trinitarios

present, knew that Zurdo was armed with a handgun. *See, e.g.*, Tr. 1213 (Diaz) (testifying that

he did not realize that Zurdo had a nine millimeter gun until "the moment when the fight

ensued"). The group of Trinitarios then proceeded to 164th Street and Fort Washington Avenue.

When the group arrived, they saw eight to 10 members of the DDPs standing on the

corner. Tr. 1978 (Cruz). The DDPs started running; the Trinitarios chased after them. *Id.*

Trinitarios member Lenin Morel (a/k/a "Cibao") struck one of the DDPs—presumably Montas—in the head with a bottle.[8]  Tr. 1213 (Diaz).  Montas fell to the ground, unconscious.  Cruz either hit Montas with a pipe, *see* Tr. 1978 (Cruz), or stabbed him, *see* Tr. 1214 (Diaz), 3839 (Nunez).  Cruz testified that he called to Zurdo because he wanted to use the gun that Zurdo had received from Leo to shoot Montas.  Tr. 1979–80.  However, because Zurdo ran after another DDP who had fled the scene, Cruz never received or fired the gun.  Tr. 1980.  Diaz, for his part, testified that he saw Zurdo aim his gun at Montas while Montas was on the ground, unconscious, but that "nothing happened," because "the bullets weren't coming out."  Tr. 1214.  Nunez corroborated this account.  *See* Tr. 3839 (Zurdo then "grabbed the gun and pulled the trigger but the gun jammed"); 4193 (Zurdo "pulled out the gun.  He was aiming for his head, pulled the trigger.  When he pulled the trigger, the bullet jammed.  All it had was one bullet in the chamber, and that bullet jammed on top, and he just started hitting him over the head and in the face with the gun.").

As to their intent, the three cooperating witnesses each testified that they had intended to either attack, fight, or beat up the DDPs present at 164th Street and Fort Washington.  None of the cooperators testified that his intent, at least at the outset, had been to kill any of the DDPs.  Diaz testified that his intent was to "fight" with the DDPs.  *See* Tr. 1212 ("Q:  And what did you intend to do at 164th Street and Fort Washington Avenue?  A:  Fight.").  Nunez testified that his intent was to "fight them, to attack them."  Tr. 4189; *see also id.* ("Q:  Was a decision made amongst the group as to what to do?  A:  We went out looking for them, so it was obvious they were DDPs.  So it was to fight them, to attack them.").  Cruz testified that his intent was "[t]o

_____

[8] Nunez also testified that Montas was knocked unconscious, but he recalled that this resulted from a blow to the head with a metal trash can.  *See* Tr. 4191–92.

attack" and "to beat up DDPs."  Tr. 2520; *see also id.* ("Q: Was it your intention to kill

someone? A: Not exactly.").

Cruz, however, testified that *his* intent evolved over the course of the altercation.  Cruz

testified on cross-examination that, before the attack began, he recognized one of the DDPs as

having been present on the day that he was stabbed.  Tr. at 2526.  He then decided to "attack

him."  *Id.*  Later on, however, Cruz "wanted to kill him."  *Id.*

> Q:  At some point this fellow who you particularly disliked was flat on the ground,
> is that right?
> A:  Yes.
> Q:  Am I correct that you stabbed him with a motion with your right hand at
> approximately a 45-degree angle to the ground?
> A:  No.
> Q:  Now, your testimony was the fellow was unconscious and you were right next
> to him, is that right?
> A:  Yes.
> Q:  When was it that your mind-set changed and you decided that you should kill
> him and not just beat him up?
> A:  He was being presented to me on a silver platter.
> Q:  Is it then that your mind-set changed and you decided you were going to kill
> him, not just beat him up?
> A:  Yes.

Tr. at 2528–29.  However, Cruz testified, because Zurdo was too far away, he never received the

gun.

> Q:  So I think you testified on direct examination [Zurdo] was too far away or doing
> something else and so you didn't get the gun and you didn't shoot the guy, is that
> right?
> A:  I never fired the gun.
> Q:  Say it again.
> A:  I never fired the gun.
> Q:  But the guy is unconscious right next to you, correct?
> A:  Yes.
> Q:  Did you think of bashing his head in?
> A:  No.
> Q:  Did you think of cutting his throat?
> A:  No.
> Q:  And you're sure in the seconds before you called Zurdo and asked him for the
> gun *that was the first time you decided you wanted to kill him*, to kill that guy?

A:  Yes.  Yes.

Tr. at 2529–30 (emphasis added).

The testimony of Cruz, Diaz, and Nunez differed with respect to Vasquez's participation. Diaz did not identify Vasquez as a participant.  Cruz testified that he saw Vasquez "trying to stab" Montas.  *See* Tr. 1979; *see also* Tr. 2663 ("And Blood tried to stab him.").  Nunez testified that Urena and Vasquez were not present during the attack on Montas, because they "ran off chasing somebody."  Tr. 3840; *see also* Tr. 4189–90, 4193 (Q:  At that time, Mr. Vasquez was not there, is that right?  A: He wasn't, in that present moment when we was beating [Montas] up, no.").[9]

## 2.      Attempted Murder under New York Law

In evaluating whether the evidence supported the jury's finding of Racketeering Act Four, the Court measures the evidence against the standards set by New York state law.  *See Pimentel*, 346 F.3d at 297.

In New York, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, [the defendant] engages in conduct which tends to effect the commission of such crime."  N.Y. Penal Law § 110.00.  "Hence, intent and conduct are each an element of attempt, . . . and the government must prove both beyond a reasonable doubt."  *Desena*, 287 F.3d

---

[9] Nunez testified that Urena told him that he and Vasquez chased some DDPs inside the building and stabbed them.  Tr. 3840.  Urena showed Nunez the knife, which "still had the grease and the blood on it."  *Id.*  Nunez also testified that Vasquez told him that he and Urena spotted a DDP running toward the building and that he and Urena chased after him and stabbed him.  Tr. 3841. This testimony, however, did not supply a basis for finding Racketeering Act Four proven, because that racketeering act charged Vasquez specifically with the attempted murder of Luis Montas.  During argument on Vasquez's Rule 29 motion, the Government confirmed that Montas, and Montas alone, was the relevant victim for purposes of considering the attempted murder charged in Racketeering Act Four.  *See* Tr. 4588–90.  And the evidence does not permit the inference that Montas was the DDP whom Vasquez and Urena purportedly chased into the building.

at 177 (citing *People v. Coleman*, 74 N.Y.2d 381, 383 (1989)).  To convict Vasquez of attempted murder, the evidence had to show that he:  (1) intended to murder Montas; and (2) committed, or aided and abetted the commission of, an act that was a substantial step towards bringing about or accomplishing that murder.  As to the second element, New York law requires that the evidence establish that the conduct charged "came 'dangerously near' commission of the completed crime."  *Id.* at 178 (citing *People v. Kassebaum*, 95 N.Y.2d 611, 618 (2001)).  "To satisfy the 'dangerously near' standard, the defendant must have carried the project forward to within 'dangerous proximity' of the intended crime, though he need not take the final step to effectuate that crime."  *Id.* (quoting *People v. Bracey*, 41 N.Y.2d 296, 300 (1977)).

### 3.    Analysis

Vasquez concedes that the evidence at trial was sufficient to establish that he participated in the attack on Montas.  He asserts, however, that the evidence was insufficient to establish beyond a reasonable doubt that he possessed the specific intent to murder Montas.

The Court agrees with Vasquez.  Viewed in the light most favorable to the Government, the evidence established that Vasquez accompanied a group of Trinitarios to 164th Street and Fort Washington with the intention to attack, and fight with, a group of DDPs.  During that altercation, Morel struck Montas in the head with a bottle, knocking him unconscious.  Vasquez then "tried" to stab him.  Zurdo pointed his gun at Montas's head and pulled the trigger, but his gun jammed.  Cruz decided, at some point, that he wanted to kill Montas, so he asked Zurdo to give him the gun.  However, Cruz never received the gun and thus did not attempt to shoot Montas.  Montas, at the hospital, was treated for facial lacerations—presumably sustained when the bottle was smashed over his head—and a 2.2-centimeter laceration on his right thigh.

On these facts, the jury could not have reasonably inferred that *Vasquez* intended to murder Montas.  To begin with, there was no direct evidence as to Vasquez's intent.  There was, for example, no testimony about any statements he made, or about an advance agreement among the attacking Trinitarios to kill their victim.

The issue, then, is what inferences can be fairly drawn about Vasquez's intent "from the defendant's conduct and the surrounding circumstances."  *Bracey*, 41 N.Y.2d at 301; *see also People v. Smith*, 79 N.Y.2d 309, 315 (1992) ("Often there is no direct evidence of a defendant's mental state and the jury must infer the *mens rea* circumstantially from the surrounding facts.") (citation omitted).  Could a jury, considering Vasquez's conduct and all the surrounding circumstances, conclude that there was no reasonable doubt that Vasquez acted with the intent to kill Montas?

As to Vasquez's conduct, the testimony, viewed in the light most favorable to the Government, was that Vasquez traveled to 164th Street and Fort Washington to attack members of the DDPs, and that, during this altercation, Vasquez "tried" to stab an unconscious Montas.  This attempted stabbing was established solely through Cruz's testimony.[10]  But Cruz did not specify *where* on Montas's person Vasquez tried to stab Montas, or, for that matter, *whether* Vasquez succeeded in stabbing him.  Had Cruz had testified that he saw Vasquez perform an inherently deadly act, such as plunging his knife into Montas's neck, head, or chest, and had the jury credited that testimony, then the jury could have reasonably inferred from this conduct that Vasquez intended to kill Montas.  *See, e.g.*, *People v. Moradel*, 278 A.D.2d 250, 251 (2d Dep't 2000) ("Contrary to the defendant's contention, the evidence of multiple stab wounds to the

---

[10] As with the murder of Phillips, Diaz did not mention Vasquez in his testimony.  Nunez's testimony as to Vasquez was that he ran after another DDP and thus was not present during the assault on Montas.

victim's head, as well as his attempt to stab the victim in the chest, was indicative of lethal intent."). But Cruz's testimony left it unknown where Vasquez was aiming when he attempted to stab Montas; and the Government did not pursue the point. *See* Tr. 1979, 2663. Moreover, Montas only sustained a stab wound on his right thigh and some lacerations on his face. Although a wound on the thigh could, in theory, be fatal, the Court is skeptical that, without more, a jury could infer an intent to kill merely from the fact that a stabber aimed at a thigh. And the wounds suffered by Montas appear to have been relatively superficial, so as to not support the inference of deadly intent. *See* Tr. 4414 (noting that Montas was discharged from the hospital on September 4, 2014, or approximately two days after he was attacked). The Court therefore concludes that the jury could not have reasonably inferred—from the testimony regarding Vasquez's conduct towards Montas—that Vasquez's actions evinced a specific intent to kill.

Whether the surrounding circumstances permitted the jury to infer beyond a reasonable doubt that Vasquez intended to murder Montas presents a somewhat closer question. The testimony was uncontroverted that the Trinitarios' intention, at least in the beginning, was to fight or attack the DDPs assembled at 164th Street and Fort Washington. No witness testified that the group planned to kill anyone when they went looking for the DDPs, or that the group intended to find and attack a specific person. On the contrary, the trial testimony supported that Zurdo and Cruz formed an intent to murder Montas only *during* the assault, not beforehand.

As to Zurdo, both Diaz and Nunez testified that Zurdo, on his own accord, pointed a gun at Montas's head and pulled the trigger, but that the gun jammed. Such conduct quite clearly evinces intent to kill under New York law. *See Pimentel*, 346 F.3d at 298 ("In the context of attempted murder prosecutions . . . New York courts have consistently held that, to survive a

26

sufficiency-of-the-evidence challenge, the Government must establish that the defendant pointed a weapon at a victim and was about to kill him with it.") (citing cases).  However, none of the three cooperating witnesses testified that they knew Zurdo intended to kill anyone before Zurdo attempted to shoot Montas in the head.  There is no basis in the evidence on which to infer that Vasquez knew this any earlier, or indeed even that Vasquez saw Zurdo attempt to fire at Montas's head.

As for Cruz, he specifically testified that he first decided, mid-attack, that he wanted to kill Montas, whom he recognized as one of the DDPs present on the day Cruz was stabbed.  *See* Tr. at 2530 ("Q: And you're sure in the seconds before you called Zurdo and asked him for the gun *that was the first time you decided you wanted to kill him*, to kill that guy?  A:  Yes.  Yes.") (emphasis added).  The evidence therefore firmly supported the conclusion that Cruz came to have the intent to murder Montas.  But Cruz did not testify that he communicated this intention to Vasquez, and there was no non-speculative basis on which the jury could conclude that Vasquez shared the same intent.  *Accord People v. Bailey*, 94 A.D.3d 904, 905 (2d Dep't 2012) (vacating conviction for second degree murder because the evidence did not prove "that the defendant shared his cohort's intention to kill the complainant"); *People v. Hayes*, 117 A.D.2d 621, 622–23 (2d Dep't 1986) ("But 'where the purpose established is less in degree than such an intention, and where the record shows merely a spontaneous act of homicide by one, the other is not, without a greater showing of a personal design to kill, guilty of murder.'") (quoting *People v. Monaco*, 14 N.Y.2D 43, 46 (1964)).

The Government's strongest argument is that the jury was entitled to infer that Vasquez intended to murder Montas from circumstantial evidence writ even larger: specifically, that a gang war was raging between the Trinitarios and DDPs in 2005 and that the "nature of the

Trinitarios Gang and the Bad Boys in particular" meant that any attack on a DDP could result in a murder.  *See* Gov. Br. 22–25.  After considered review, however, the Court is unpersuaded by this argument.  To be sure, the Montas incident should not be considered in a vacuum.  The overall violent character of the gang and the Bad Boys is highly relevant context.  *See* Gov. Br. 17 ("The jury is entitled to consider the totality of the evidence and to consider each discrete piece of evidence in light of the color added by the whole.").  But it overreaches to argue that because *some* attacks on DDPs resulted in murder or attempted murder, the jury was permitted to infer that *all* attacks on rival gang members were intended by all Trinitarios attendees to so result.[11]

---

[11] The Government separately argues that the jury could have found intent to murder on Vasquez's part based on the fact that Vasquez only participated in Trinitarios-related violence when at least one of the participants in the attack intended to murder someone:

> Notably, unlike the Government's cooperating witnesses, and unlike co-defendant Urena, there was no evidence that in the period before he was arrested in June 2006, Vasquez was ever involved in any Trinitarios assaults or that he ever participated in a violent attack against rival gang members in which no one sought to murder the victims.  As the evidence showed, in each of the three violent incidents in which Vasquez was involved in the short time span of less than [a] year, at least one Trinitario involved in the attack plainly intended to murder the target of the attack.

Gov. Br. 9.  This argument, with respect, is totally unpersuasive.  It is based on a blatant correlation fallacy.  The Government implies that the presence of Vasquez at the scene of an attack inherently signals that the attack was intended to result in death.  But the Government offers no logical reason why this would be so.  Instead it relies solely on the fact that in the three violent incidents as to which it offered evidence of Vasquez's presence, at least one participant intended to kill.  But, despite the fact that fully seven gang members testified as cooperating witnesses, the trial evidence does not suggest that any Trinitarios ever made a strategic decision to deploy Vasquez solely for murderous incidents, let alone any reason why this decision would be taken.  Quite the contrary:  The depiction of Vasquez as a latter-day Grim Reaper, whose presence signified the intended imminent death of the Trinitarios' target, is belied by the trial testimony, which showed many Trinitarios attacks to have unfolded impulsively and with little forethought, based on actual or perceived provocations by the gang's rivals.

Indeed, each cooperating witness testified about incidents of mayhem and violence against the DDPs or other rival gangs that fell far short of murder or attempted murder. And the overall evidence showed that although the Trinitarios' *modus operandi* was to fight with, and attack, members of rival gangs, these attacks only sometimes came "dangerously close" to murder, as that phrase is defined by New York law.

In this particular instance, the Court concludes, the jury could have reasonably concluded that (1) Vasquez participated in a fight between the Trinitarios and the DDPs, and (2) during that fight, two other Trinitarios, Zurdo and Cruz, formed the intent to kill Montas. But as to Vasquez specifically, the evidence is far too sparse for the jury to have concluded beyond a reasonable doubt that Vasquez possessed an intent to kill.[12]

To illustrate why the circumstances of the Montas attack were not sufficient to attribute murderous intent to Vasquez, it is helpful to contrast the Montas incident with the Phillips murder, discussed earlier. The evidence there established that the attack on Phillips was a targeted "hit" on a specific victim. Before traveling to Yonkers, the Trinitarios, including Vasquez, spoke to the Yonkers affiliates about retaliating against Phillips and agreed to do so. Vasquez and the other Trinitarios then armed themselves with several knives and two loaded handguns, and traveled in a van to Yonkers. Once there, the Yonkers affiliates specifically

---

[12] At the close of the Government's case, the Court expressed skepticism whether Racketeering Act Four could survive a Rule 29 challenge. *See* Tr. 4700–01. However, because it regarded this question as close, meriting thoughtful attention, and because the evidence of the Montas attack was independently admissible to prove the racketeering conspiracy such that a ruling in Vasquez's favor would not change the evidence before the jury, the Court elected not to preempt the jury's consideration of that racketeering act, and denied the motion. The Court, however, invited Vasquez to renew that motion in the event that the jury convicted him of racketeering and found Racketeering Act Four proven. *See* Tr. 4701 ("In the event the jury finds this racketeering act proved, I'll be glad to receive and consider a fully briefed motion directed to the point and to resolve the issue, this time on the basis of full briefing.").

pointed Phillips out as the person to be attacked.  That attack unfolded in a coordinated fashion, beginning with Toribio firing gunshots, unprovoked, at Phillips; and continuing, once Phillips was wounded, with the Trinitarios, including Vasquez, swarming Phillips and stabbing him more than 20 times in the upper body before Urena shot Phillips in the head.  And all five Trinitarios members who participated in the attack—including one, Franco, who stood across the street while it occurred—admitted intent to murder.  Based on these events, a reasonable jury could have concluded that each Trinitarios gang member who traveled to Yonkers, including Vasquez, came with or soon developed the intent to murder Phillips.

By contrast, the attack on Montas was not a targeted hit.  It was more akin to the opportunistic and impulsive violence and fighting most characteristic of the Trinitarios' interactions with rival gangs.  Montas was knocked unconscious but otherwise suffered a stab wound to his leg and some cuts on his face.  The Trinitarios did not swarm him or stab him repeatedly, even though he was unconscious and lay helpless on the ground, and they did not shoot him.  Although the jury heard testimony that Zurdo *tried* to shoot Montas, and that Cruz *wanted* to shoot him, the testimony supported only that those two gang members formed the intent to murder Montas *during* the attack, not beforehand.  There was no non-speculative basis on which a jury could find Vasquez's intent similarly shifted towards murder during the attack.[13]

---

[13] Separately, Vasquez asserts that the conduct that the Trinitarios engaged in did not come "dangerously close to" the murder of Montas.  The Court does not accept that argument, at least as to Zurdo.  The jury *could* have reasonably concluded that Zurdo's conduct—pointing a loaded gun at Montas's head and pulling the trigger—came dangerously close to murder.  *See generally Pimentel*, 346 F.3d at 298.  There is, however, no basis for inferring intent by Vasquez to murder based on Zurdo's actions.

For these reasons, considering the evidence at trial in the light most favorable to the

Government, the evidence was insufficient to support a finding that Vasquez intended to murder

Montas.[14]  Accordingly, the Court overturns the jury's finding as to Racketeering Act Four.[15]

### D.     Racketeering Act Nine and Count Eight

Racketeering Act Nine and Count Eight are identical—both charge Vasquez with

participating in a narcotics conspiracy involving 100 kilograms and more of marijuana, 28 grams

and more of "crack" cocaine, a quantity of powder cocaine, and a quantity of oxycodone, in

violation of Title 21, United States Code, Sections 841 and 846.[16]

"Section 846 proscribes attempts or conspiracies to commit the substantive narcotics

offenses contained in the federal Controlled Substances Act, which criminalizes, among other

things, the manufacture, distribution, or dispensing, or the possession with intent to manufacture,

distribute, or dispense of a controlled substance."  *Pimentel*, 346 F.3d at 300 (internal quotation

marks and brackets omitted).  To sustain Vasquez's conviction, the Government was therefore

---

[14] The jury also concluded that Racketeering Act Four was proven as to Urena.  Urena has not
filed a motion for post-trial relief.  The Court therefore has not considered whether the evidence
as to Racketeering Act Four supports the jury's finding that that racketeering act was proven as
to him.

[15] This ruling does not call into question the jury's findings that Vasquez was guilty of Counts
One, Two, and Eight.  The evidence of the attack on Montas was independently admissible to
establish elements of Counts One and Two—including the existence and purposes of the gang as
a racketeering enterprise and Vasquez's participation in it.  *See* Tr. 4701 ("I would note, as I
mentioned in the course of colloquy with counsel, that by all accounts the evidence relating to
this act is equally admissible whether this particular racketeering act is or is not submitted to the
jury and so the decision to sustain for now [Racketeering Act Four] does not in any sense affect
the pool of evidence that will be before our jury.").  And the trial evidence was sufficient to
establish Vasquez's guilt beyond a reasonable doubt on those counts, including, as noted in this
decision, the other two racketeering acts with which Vasquez was charged in Count One.

[16] The Indictment also alleged that an object of the narcotics conspiracy was to distribute
suboxone.   The Government voluntarily dismissed that object as to both defendants.

required to prove two elements beyond a reasonable doubt:  (1) the existence of an agreement or understanding to distribute narcotics; and (2) Vasquez's knowing and intentional participation in the conspiracy.  *See United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004) ("[T]he government must present 'some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.'") (quoting *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004)).

As to the first element, Vasquez does not contest that the jury had sufficient evidence to conclude that members of the Bronx Trinitarios Gang conspired to distribute large quantities of marijuana, powder cocaine, crack cocaine, and oxycodone.  Each cooperating witness testified in detail regarding the gang's prodigious distribution of drugs in New York City, including in the Bronx.  Vasquez challenges his conviction solely as to the second element—he asserts that the jury could not have concluded that he knowingly and intentionally joined, and participated in, the conspiracy.  *See* Def. Br. 33.

That argument is quickly interred.  The evidence at trial was overwhelming that Vasquez knowingly participated in the Trinitarios' drug-dealing operation.  Several cooperating witnesses, for instance, testified that the area around 174th Street and St. Nicholas Avenue was an active "drug spot"—*i.e.*, a location where drugs were distributed—controlled by the Trinitarios.  *See, e.g.*, Tr. 232 (Gonzalez), 2157 (Cruz), 3807 (Nunez).  And Cruz and Nunez both testified that they personally witnessed Vasquez selling drugs from that location.  *See* Tr. 2157–59 (Cruz), 3807–13 (Nunez).

More specifically, testimony from law-enforcement and cooperating witnesses directly implicated Vasquez in two drug-related incidents in the vicinity of 174th Street and St. Nicholas

Avenue, the first in 2006 and the second in 2009.  In the first, two men were shot, non-fatally, near 174th Street and St. Nicholas Avenue on June 28, 2006.  *See* Tr. 2038–49 (Cruz).  Detective Joseph Carinha testified that Vasquez admitted to him afterwards that these two men had expressed an interest in buying a large quantity of marijuana from the Trinitarios crew that was selling drugs in that location.  Tr. 3172–73.  However, one of the Trinitarios, Jose Pichardo, concluded that the men's stated intention to buy marijuana was a ruse, and that they intended, instead, to rob him.  Pichardo, therefore, told Vasquez to retrieve Pichardo's .380 semi-automatic handgun.  *See* Tr. 3178–80.  Vasquez retrieved the handgun from an alleyway, and gave it to Pichardo.  At trial, the Government introduced a surveillance tape, through the testimony of both Cruz and Detective Carinha, which showed Vasquez handing the gun to Pichardo minutes before the two men were shot.  *See* GX 151; *see also* Tr. 2038–49 (Cruz), 3183 (Carinha).  Pichardo then used the gun to shoot the two men.  The jury was entitled to credit this testimony and the videotape, and to conclude that (1) Vasquez was directly involved in this shooting, and (2) the shooting was committed for the purpose of protecting a Trinitarios "drug spot."  From these two facts, the jury could reasonably infer that Vasquez was a member of the Trinitarios' drug-dealing conspiracy in 2006.

In the second incident, cocaine was recovered in Vasquez's apartment at 601 W. 174th Street on August 15, 2009.  Detective Edwin Salas testified that he conducted surveillance of that apartment building, and observed, on multiple occasions, Vasquez—along with an individual named Anthony Rodriguez—acting as "a lookout or a steerer" for drug sales that were taking place inside the building.  Tr. 3582–85.  Detective Salas thereafter obtained and executed a valid search warrant for the building's apartment 5B, in which Vasquez and Rodriguez resided.  *Id.* During the ensuing search, Detective Salas recovered "a quantity of powder cocaine" in

33

Rodriguez's bedroom in the apartment.  Tr. 3589–92.  Although the testimony at trial did not identify Rodriguez as a member of the Trinitarios, there was ample testimony that the Trinitarios frequently used non-Trinitarios to help them sell drugs.  The jury was therefore entitled to infer from Detective Salas' testimony—and from all the previous testimony regarding drug sales at 174th Street and St. Nicholas Avenue—that Vasquez was engaged in selling drugs for the Trinitarios in 2009.

Viewing all of the evidence presented at trial, the jury could have reasonably concluded that Vasquez knowingly joined and participated in the Trinitarios' conspiracy to distribute narcotics.  Accordingly, Vasquez's motion for a judgment of acquittal as to Racketeering Act Nine and Count Eight is denied.

### E. Conclusion

There is sufficient evidence to support the jury's findings of "proven" as to two racketeering acts, Racketeering Act One (Part A) and Racketeering Act Nine.  In light of this determination, and because the evidence supported the jury's necessary finding that the other elements of Count One were established beyond a reasonable doubt, the Court denies Vasquez's motion for a judgment of acquittal as to the racketeering charge in Count One.  The Court also denies Vasquez's motion for a judgment of acquittal as to Count Eight, conspiracy to distribute narcotics.

## II. Motion for a New Trial

Vasquez asserts, alternatively, that a new trial is warranted under Rule 33 to prevent "manifest injustice."  Def. Br. 34.

A.      **Legal Standards**

Rule 33 provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. Pro. 33(a).  The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *See United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  In exercising its discretion, however, the court must be careful not to usurp the role of the jury; the court must defer to the jury's assessment of witnesses and its resolution of conflicting evidence unless "exceptional circumstances can be demonstrated."  *Id.* at 1414.  Ultimately, the court must decide "whether letting a guilty verdict stand would be a manifest injustice."  *See United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  "The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  *Id.*  After doing so, "[t]here must be a real concern that an innocent person may have been convicted" in order to grant the motion.  *Sanchez,* 969 F.2d at 1414.  The Court may only exercise its Rule 33 authority "sparingly" and in "the most extraordinary circumstances."  *Ferguson*, 246 F.3d at 134.

B.      **Analysis**

There is nothing whatsoever extraordinary about these circumstances.  The evidence was more than sufficient to support Vasquez's convictions for the offenses charged in Count One, Count Two, and Count Eight.  And although the Court has set aside the jury's finding that Racketeering Act Four, the attempted murder of Luis Montas, was proven against Vasquez, there was ample evidence on which the jury could conclude that the other two racketeering acts of which he was accused of committing were proven beyond a reasonable doubt—namely, conspiracies to murder Ka'Shawn Phillips and to distribute narcotics.

More importantly, however, Vasquez's trial was fair in all respects.  He had the benefit of being represented by two highly experienced, energetic, and talented defense counsel appointed to represent him.  He received fulsome discovery from the Government; he had an opportunity to file both legal motions and motions *in limine* and did so; and he obtained early access to the Government's Section 3500 material.  At trial, his counsel ably cross-examined most of the Government's witnesses and called several witnesses on Vasquez's behalf.  His counsel also made jury addresses that, in the Court's estimation, effectively marshaled the evidence and captured the best arguments available to Vasquez.  The jury's verdict, in turn, reflected a discriminating assessment of the evidence, and indeed, acquitted Vasquez of the most serious charge, Count Three, which carried a mandatory sentence of life imprisonment.  The Court's assessment was that the jury was highly conscientious and attentive, and its verdict is consistent with a close examination of the evidence, on a count by count basis, with respect to Vasquez.

Accordingly, the Court concludes that leaving the jury's verdict intact as to Counts One, Two, and Eight would not constitute "a manifest injustice," as is required under Rule 33.  Far from it:  The verdict in this case was, in the Court's judgment, just.  Because no "miscarriage of justice" occurred, Vasquez's motion for a new trial is denied.

## CONCLUSION

For the foregoing reasons, the Court denies Vasquez's motion for a judgment of acquittal under Rule 29 as to Count One and Count Eight, and denies the motion for a new trial under Rule 33.  The Clerk of Court is directed to terminate the motions pending at docket numbers 1223 and 1224.

Sentencing for Vasquez will go forward, as scheduled, on November 21, 2014 at 4 p.m. Vasquez's sentencing submission will be due by November 7, 2014, and the Government's submission will be due November 14, 2014.[17]

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 18, 2014
      New York, New York

---

[17] Sentencing for Urena will also go forward, as scheduled, on November 21, 2014 at 2 p.m. Accordingly, Urena's sentencing submission will be due by November 7, 2014, and the Government's submission as to Urena will be due November 14, 2014.